**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ANNE BRANDON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:15-cv-01804-RDP** |
| | } | |
| **GLAXOSMITHKLINE, LLC,** | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION**

## I.     Introduction

This case is before the court on Defendant's Motion for Summary Judgment (Doc. # 83),

Plaintiff's Motion to Strike Declarations (Doc. # 91), and Defendant's Objection and Motion to

Exclude Sham Declarations (Doc. # 98). The motions are fully briefed and under submission.

(*See* Docs. # 93, 95, 100, 110, 111). After careful review, and for the reasons explained below,

Defendant's motion for summary judgment is due to be granted. Plaintiff's motion to strike is

due to be denied. Defendant's objection and motion to exclude is due to be granted in part and

denied in part.

## II.     Evidentiary Challenges to the Rule 56 Record

At certain points in time, this case has been a voracious consumer of judicial resources.

Indeed, at one stage, the court noted that discovery in this case has resembled a dumpster fire.[1]

And, not surprisingly, Plaintiff and Defendant both challenge significant portions of the record

presented by the opposing party. Plaintiff seeks to strike the declarations of Kareema Abdul-

Barr and Kelly Raymer. (Doc. # 91 at 1). Defendant seeks to exclude declarations from Plaintiff

---

[1] (Doc. # 63 at 1 & n. 2).

and Gina Pearson, one of Plaintiff's former attorneys. (Doc. # 98 at 5-7). Defendant also requests that the court not consider the summaries submitted by Plaintiffs. (Doc. # 100 at 5).

**A. The Court Will Excuse Any Procedural Improprieties in the Parties' Evidentiary Challenges**

Plaintiff and Defendant both raise procedural objections to the other party's evidentiary challenges. Both Plaintiff and Defendant argue that the other party used the wrong procedural instrument to challenge the Rule 56 evidentiary submissions. (Docs. # 93 at 2-3; 110 at 1-2). Moreover, both parties contend that the other party's motion should be stricken for failure to confer prior to filing. (Docs. # 93 at 3-4; 110 at 2).

The parties' disagreement about the proper vehicle for challenging Rule 56 evidence is rooted in different approaches that federal courts take on this issue. Some courts permit motions to strike that challenge evidence submitted into the Rule 56 record because the Federal Rules of Civil Procedure do not provide another means to contest the evidence's sufficiency. *See, e.g.*, *Morris v. Precoat Metals*, 2013 WL 830868, at *2 (N.D. Ala. Mar. 4, 2013) (explaining that a motion to strike can be treated like a motion *in limine*). Other courts allow a party to challenge Rule 56 evidence through a motion to exclude. *E.g.*, *UCB, Inc. v. Teva Pharm. USA, Inc.*, 2015 WL 11199058, at *9 (N.D. Ga. Mar. 18, 2015). Still other courts require a party to challenge the opposition's factual assertion, rather than its submitted evidence, on the ground that the factual assertion "cannot be presented in a form that would be admissible in evidence." *E.g.*, *Norris v. GKN Westland Aerospace, Inc.*, 2013 WL 440755, at *1 (M.D. Ala. Feb. 5, 2013) (quoting Fed. R. Civ. P. 56(c)(2)). Given the divergent case law on this issue, the court finds it appropriate to consider the merits of Plaintiff's motion to strike and Defendant's motion to exclude. *Cf. Stuckey v. Ala. Bd. of Pardons & Paroles*, 2012 WL 3670644, at *1 n. 2 (M.D. Ala. Aug. 27,

2012) (considering the substance of a party's motions to strike even though "the form of the motions is not grounded in a federal procedural rule").

The parties' failures to meet and confer before issuing their evidentiary challenges do not present a basis for disregarding their evidentiary challenges. Plaintiff did not violate any meet and confer obligation, as Rule 37(c) does not require her to meet and confer with Defendant before seeking sanctions for the alleged non-disclosure of witnesses. *E.g.*, *Greene v. Alan Waxler Grp. Charter Servs., LLC*, 2014 WL 1089667, at *2 n. 5 (D. Nev. Mar. 18, 2014); *Castro v. City of Mendota*, 2012 WL 4344087, at *2 (E.D. Cal. Sept. 20, 2012). And, both parties indicate that their evidentiary motions are opposed. (Docs. # 91 at 1; 98 at 1). Therefore, the court will not disregard either motion due to any failure to meet and confer.[2]

### B.    Admissibility of Plaintiff's Declaration

Plaintiff has submitted a 26 page declaration to supplement the testimony she gave during her long deposition. (Doc. # 92-1). Defendant insists that the entire declaration should be excluded from the Rule 56 record because (1) certain averments impermissibly contradict testimony Plaintiff gave during her deposition, (2) other averments contain hearsay statements, and (3) the rest of the declaration contains ultimate legal conclusions, statements not based upon personal knowledge, and/or irrelevant issues. (Doc. # 98 at 8-14). As explained in detail below, this request is due to be granted in part and denied in part.

---

[2]    Defendant asks the court to ignore Plaintiff's response to its motion to exclude because she filed an untimely response under the court's Non-Summary Judgment Briefing Schedule. (Doc. # 111 at 1-2). Plaintiff reasonably could have believed that the motion to exclude should be briefed under the lengthier summary judgment briefing schedule, but her response was untimely under the court's summary judgment briefing schedule as well. Nevertheless, the court declines Defendant's invitation to disregard Plaintiff's response to its motion to exclude. As Defendant has addressed the merits of Plaintiff's response, the court discerns no prejudice suffered by Defendant due to Plaintiff's untimely response brief.

### 1.     Plaintiff's Purported Sham Declarations

"A court may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction." *Latimer v. Roaring Toyz*, 601 F.3d 1224, 1237 (11th Cir. 2010). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). The court must apply the sham affidavit doctrine sparingly, though, "because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987)). For example, the court should not use the sham affidavit doctrine to disregard a declarant's testimony where the declarant expressed a lack of certainty or recall during his or her deposition. *See id.* at 1316-17 (holding that plaintiffs' written averments about uncompensated work time should not be disregarded as shams where the plaintiffs expressed a lack of certainty during depositions). Further, not every item that could serve as the basis to impeach a party-witness with earlier deposition testimony will lead to that party-witness's testimony being struck. A slight contradiction or an arguable contradiction is not enough. If portions of an affidavit are inadmissible, the court will disregard the inadmissible testimony and consider the admissible testimony from that affidavit in analyzing the summary judgment motion. *Lee v. Nat'l Life Assur. Co. of Canada*, 632 F.2d 524, 529 (5th Cir. 1980).

Here, paragraph 16 of Plaintiff's declaration does not contradict her earlier deposition testimony. Plaintiff testified during her deposition that members of the community pharmacy

team on which she worked were "asked to put in" information about contacts with pharmacies based on the pharmacy contacted, rather than the individual that the liaison spoke with. (Doc. # 82-3 at 94-95). Plaintiff did not specify when she was instructed to enter contact data under the pharmacy account rather than the individual with whom she had spoken. (*See id.*). Plaintiff's declaration explained that she was never instructed to enter sales calls under the pharmacy account before December 2013. (Doc. # 92-1 at 6). This averment clarifies when Plaintiff was instructed to enter data under the pharmacy accounts and, thus, does not contradict the testimony given during her deposition. Accordingly, Defendant's request to exclude paragraph 16 of Plaintiff's declaration is due to be denied.[3]

Similarly, there is no contradiction between Plaintiff's earlier deposition testimony and paragraph 21 of her declaration. Plaintiff has averred in her declaration that Candace Brown maintained spreadsheets -- outside of the GSK 360 database program -- to track the community pharmacy team's progress toward the "Breo launch goal." (Doc. # 92-1 at 7). During her deposition, she recounted Brown's creation of the spreadsheets and her personal knowledge about Brown's entry of data into those spreadsheets. (Doc. # 82-3 at 120-21). Because paragraph 21 of Plaintiff's declaration merely expands upon testimony she gave during the deposition, Defendant's request to exclude that paragraph is due to be denied.

However, Plaintiff's testimony in paragraph 22 of the declaration substantially differs from her testimony during the deposition. During her deposition, Plaintiff professed ignorance when asked if a third party could access her data on the GSK 360 database:

> Q.    It is your knowledge -- you have knowledge as you sit here today that the
>       system allows others to change data?

---

[3]  Defendant has not explained how paragraph 17 of Plaintiff's declaration contradicts any portion of her deposition testimony. Indeed, Plaintiff testified during her deposition that she needed to complete the Breo sales calls by January 24, 2014. (*See* Doc. # 82-3 at 96-97). Defendant's request to exclude paragraph 17 of Plaintiff's declaration is due to be denied.

MS. PEARSON:          Object to the form.

A.          All I can say is that data I entered disappeared.

Q.          Yes, ma'am.  And if you entered the data, you would agree with me that there would be some evidence that it had been entered, wouldn't there?

MS. PEARSON:          Object to the form.

A.          No, sir.  In theory, yes.  There were problems with GSK 360.  I don't know if -- I don't know the access into GSK 360 beyond my role as a community pharmacy liaison.

Q.          Yes, ma'am.

A.          I knew what I was taught to do to enter the data, but how it could be manipulated by a third-party, I don't know.

Q.          You have no clue as you sit here today about whether a third-party can manipulate your data at all, do you?

MS. PEARSON:          Object to the form.

A.          I don't know -- I don't know how that would work.

(Doc. # 83-2 at 115-16).  Quite to the contrary, Plaintiff's declaration asserts that Candace Brown was able to access GSK 360 account data.  "In order to obtain information to populate her spreadsheets, Ms. Brown gained access to each team member['s] GSK 360 account data.  Prior to Ms. Brown accessing my GSK 360 account, none of my data disappeared and I had no problems using the account."  (Doc. # 92-1 at 8).  So, while Plaintiff previously testified during her deposition that she only knew about her own access to GSK 360 data, she has now averred in her declaration that Brown gained access to her GSK 360 data to populate the spreadsheets she had created.  Thus, Plaintiff's subsequent affidavit testimony sharply contradicted her earlier deposition, yet Plaintiff has not offered any explanation for her new-found knowledge.  (*See* Doc. # 110 at 4-5) (explaining that Plaintiff's testimony regarding her suspicions of Brown's

access to GSK 360 data is relevant to her good faith belief that Gina Chaney sought to sabotage her). Due to the unexplained contradiction between Plaintiff's deposition testimony and the declaration, paragraph 22 of the declaration is due to be excluded from the Rule 56 record.[4]

Plaintiff's averments in paragraph 51 of the declaration do not contradict her sworn deposition testimony. Plaintiff states in her declaration that (a) a record of failing to meet deadlines could have ruined her pharmaceutical sales career, and (b) Defendant's employees never informed her that she would receive her territory back after the delegations made during the Breo launch period. (Doc. # 92-1 at 16). During Plaintiff's deposition, she affirmed that Gina Chaney had made a "temporary" assignment of certain pharmacy accounts. (Doc. # 82-3 at 150). But, Plaintiff denied having any knowledge of whether Chaney would assign the pharmacies back to her after the Breo launch:

> Q.    You were going to get [those accounts] back once the goal was met?
>
> A.    I don't know that was true.

(*Id.*). Certainly, a jury could consider the discrepancy in Plaintiff's deposition testimony as evidence weighing against her credibility. However, paragraph 51 of the declaration sufficiently aligns with her denial of knowledge that she would be reassigned the pharmacies, and Defendant's request to exclude that paragraph is due to be denied.[5]

---

[4]   The court need not address Defendant's personal-knowledge objection to paragraph 22 of the declaration. Plaintiff testified during her deposition that she was not aware of missing data from the GSK 360 system before December 2013, and that averment remains in the Rule 56 record. (*See* Doc. # 82-3 at 101) (stating that Plaintiff was notified of "holes in [her] reporting" during that month).

[5]   The court will also deny Defendant's request to exclude paragraph 56 of the declaration. Plaintiff's assertion that Chaney promoted Brown to a new position corresponds with her deposition testimony that Chaney controlled promotions for members of the community pharmacy team. (Docs. # 82-3 at 81; 92-1 at 18).

Defendant's challenges to paragraph 60 of the declaration are wholly without merit. In that paragraph, Plaintiff discusses her divorce proceedings, her daughter's 2014 overdose on ibuprofen, and the stressors from work that led her to engage in therapy with a licensed social worker. (*See* Doc. # 92-1 at 19). Although Plaintiff testified during her deposition that a contempt hearing with her ex-husband caused some stress, she said nothing about whether her 2009 divorce was a stressor. (*See* Doc. # 82-3 at 69-70). Nor did she claim that she engaged in therapy

### 2. Plaintiff's Recollections of Statements Made by Defendant's Employees

Defendant objects to what it contends are hearsay statements provided in several paragraphs of Plaintiff's declaration. (Doc. # 98 at 12). Plaintiff responds that the statements in her declaration can be reduced to admissible form, but does not explain how she intends to do so. (Doc. # 110 at 3-4). Although Plaintiff does not refer to this issue in her response brief, Defendant's hearsay objections mainly relate to statements from her supervisor, Chaney, her co-workers Tresa Darr Johnson and Candace Brown, and other employees of Glaxosmithkline. (*See* Doc. # 98 at 12) (objecting to declarations about statements from Gina Chaney, Sherida Dorsey-Pete, Tresa Darr Johnson, Danielle Fedor, Carolyn Harris, and Candace Brown). Almost all of these statements concern the employee's own feelings or mental impressions, and almost all of them occurred during work activities. (*See, e.g.* Doc. # 92-1 at 12) (recounting Chaney's admonishments to the community pharmacy team after a meeting with Chaney's supervisor). To the extent Plaintiff's declarations contain statements from Defendant's employees with double hearsay, the statements reflect conversations between Defendant's employees within the scope of their duties. (*See, e.g.*, Doc. # 92-1 at 8) (recounting Johnson's conversation with Chaney about GSK 360 remedial training). The court finds that Plaintiff's declarations in Paragraphs 13, 25, 26, 29-31, 35-37, 46, 50, 52, and 65 are admissible as statements by Defendant's agents on matters within the scope of their employment. Fed. R. Evid. 801(d)(2)(D). Moreover, Plaintiff's declaration that Brown derisively called her "Paula Deen" is not hearsay because the statement is being offered to show its effect on Plaintiff, rather than the truth of the matter asserted. (Doc. # 92-1 at 23). *See also* Fed. R. Evid. 801(c); *Macuba v. Deboer*, 193 F.3d 1316, 1323-24 & n. 15

---

due to stress from the contempt proceedings. (*Id.* at 70). Likewise, Plaintiff admitted during her deposition that her daughter's overdose caused her stress, but Defendant's counsel never asked Plaintiff whether she sought therapy due to the stress from her daughter's medical incident. (*Id.* at 75-76).

(11th Cir. 1999) (citing an advisory committee's note for the proposition that a statement is not hearsay if its significance "lies solely in the fact that it was made").[6]

### 3. Plaintiff's Testimony Based on Belief and Speculation

According to Defendant, several paragraphs in Plaintiff's declaration are due to be stricken because she has testified about matters based on her beliefs and speculations. (Doc. # 98 at 13). It is well settled that testimony based on an individual's belief or speculation is not competent summary judgment evidence because such testimony is not based on personal knowledge. *E.g.*, *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) (rejecting a district court's reliance on an affiant's statement that he believed a particular fact); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) ("Of course, the requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise."); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) ("[S]tatements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this [personal knowledge] requirement."); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1301 n. 46 (11th Cir. 2012) (noting that an affiant's assumptions are not admissible under Rule 56(e)). Some of Defendant's personal knowledge objections are well taken; others are meritless.

In paragraph 21 of the declaration, Plaintiff states that Candace Brown created tracking spreadsheets outside of the GSK 360 database. (Doc. # 92-1 at 7). She has not averred that she believes Brown created and managed the spreadsheets. (*See id.*). Indeed, Brown herself has testified that she assisted Chaney "by monitoring progress on the spreadsheets as well as the GSK 360 call activity." (Doc. # 83-43 at 4). Defendant has not shown that paragraph 21 of Plaintiff's declaration should be excluded.

---

[6] The court need not address the other hearsay objections made by Defendant because the other averments challenged do not present material evidence.

In paragraph 27, Plaintiff avers, "I believe Ms. Brown used the access Ms. Chaney allowed her to delete most of my work since the Breo launch period began approximately one month prior." (Doc. # 92-1 at 9). This declaration plainly relies on Plaintiff's beliefs and, thus, is inadmissible at the summary judgment stage. *Jones*, 683 F.3d at 1301 n. 46; *Pace*, 283 F.3d at 1278-79.

Paragraphs 50 and 51 of Plaintiff's declaration present a few inadmissible statements, along with admissible recollections of Chaney's actions in January 2014 and the lack of communication between Plaintiff and Defendant's employees about those actions. Plaintiff has asserted her "understanding" that (a) Chaney sought to undermine Plaintiff's professional reputation by reassigning duties to other team members, and (b) the team members "called their take over of my territory 'Operation Alabama.'" (Doc. # 92-1 at 16). Testimony based on a witness's understanding is comparable to belief testimony and inadmissible under Rule 56. *E.g.*, *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1377 (9th Cir. 1978) (explaining that a witness's testimony based on understanding was insufficient to show that the witness could present competent testimony at trial); *Rolison v. Sterling*, 2009 WL 2514294, at *5-6 (S.D. Ala. Aug. 13, 2009) (striking an averment that began with a qualifying phrase based on the affiant's understanding). Defendant's request to exclude these statements in paragraph 50 is due to be granted. But, its request to exclude the entirety of paragraphs 50 and 51 is due to be denied.[7]

Defendant's objections to Plaintiff's testimony about alleged "ultimate legal conclusions" are misplaced. (Doc. # 98 at 13-14). Lay witnesses may offer opinion testimony on the ultimate issue of a case if the testimony is based on personal observations. *Carter v.*

---

[7] Defendant's motion to exclude does not expressly challenge Plaintiff's averment that "a record of not meeting my deadlines could ruin my career." (Doc. # 92-1 at 16). Even if Defendant intended to contest this testimony, the court need not decide whether it is admissible under Rule 56 because it is not material evidence.

*DecisionOne Corp. Through C.T. Corp. Sys.*, 122 F.3d 997, 1005 (11th Cir. 1997). Plaintiff's averment that Harriss harassed her was based on her personal observations from phone calls. (*See* Doc. # 92-1 at 21). Likewise, her assertion that no reasonable person could have continued to work for Defendant under the conditions she faced was based on her personal observations about her work conditions. (*Id.* at 22). Therefore, both opinions are admissible, at least at this stage. *See Carter*, 122 F.3d at 1005 (explaining that Federal Rule of Evidence 704 abolished the prohibition on admitting lay opinion testimony about ultimate issues).

### C. Admissibility of Gina Pearson's Declaration

Defendant argues that the court should exclude Pearson's declaration because (1) she submitted the declaration while representing Plaintiff as counsel, and (2) the declaration contains hearsay evidence from witnesses who declined to submit declarations on Plaintiff's behalf. (Doc. # 98 at 7, 14-15). Defendant's first argument misses the mark for excluding the declaration from the Rule 56 record. If Pearson was a necessary witness in this case, she would likely be disqualified from representing Plaintiff as counsel. *See* Ala. R. Prof. Conduct 3.7(a). But, she would not be disqualified from presenting the necessary evidence at trial. In any event, Pearson no longer represents Plaintiff. The court will not exclude Pearson's declaration on this basis.

Defendant's second argument, though, hits the target. Pearson's declaration narrates her communications with three of Plaintiff's former co-workers. (*See* Doc. # 108-1 at 2-16). She states that the co-workers "were initially cooperative, engaging, and expressed a desire to willingly sign a declaration," but her communications with them "suddenly" ended at the same time and none of them signed a declaration on Plaintiff's behalf. (*Id.* at 16). Pearson has attached copies of her e-mail correspondence with the potential witnesses, purported drafts of a

complaint letter against Chaney, and purported drafts of declarations to be signed by the potential witnesses. (*See id.* at 18-99). By and large, Pearson's declaration presents inadmissible hearsay evidence and unauthenticated evidence, including a complaint letter with no signature from the purported drafter and declarations with no signatures from the declarants. In essence, Pearson is declaring that *if* certain witnesses testified in this case, based upon her discussions with them, she believes they would testify to "x, y, and z." Of course, the Seventh Circuit has cautioned that the submission of affidavits by counsel is "a tactic fraught with peril." *Cf. Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987). Defendant's request to exclude Pearson's declaration is due to be granted, as all relevant evidence in that declaration is inadmissible hearsay.[8]

### D. Admissibility of Kareema Abdul-Barr's and Kelly Raymer's Declarations

Plaintiff contends that the court should strike Abdul-Barr's and Raymer's declarations because Defendant did not disclose these witnesses in its initial disclosures, supplemental disclosures, or interrogatory answers. (Doc. # 91). Defendant responds that (1) Plaintiff identified Abdul-Barr as a witness in her supplemental disclosures, (2) Plaintiff stated that Raymer was a member of the community pharmacy team during her deposition, (3) their declarations constituted protected work product until Defendant filed them in support of its summary judgment motion, and (4) Plaintiff will not be prejudiced by the court's consideration of the declarations because she chose to not depose these witnesses. (Doc. # 93).

The Federal Rules of Civil Procedure generally require a party to disclose the names of individuals likely to have discoverable information that will be used to support a claim or defense. Fed. R. Civ. P. 26(a)(1)(A). This initial disclosure must be supplemented in a timely

---

[8] In her declaration, Pearson asserts that the communications and attached documents could be admitted at trial as impeachment evidence. (Doc. # 103-1 at 16). Impeachment evidence, however, cannot be used to create a genuine issue of material fact for trial. *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996).

manner if the initial disclosure was materially incomplete "and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process." *Id.* 26(e)(1)(A). Rule 37 prohibits a party from using a witness's testimony to support a motion if it has failed to identify that witness in accordance with Rule 26, unless the failure to disclose was substantially justified or harmless. *Id.* 37(c)(1).

Plaintiff's objection to Abdul-Barr's affidavit is plainly meritless. Defendant disclosed in its amended initial disclosures that the witnesses identified in Plaintiff's initial disclosures might be used to support its defenses, as well as witnesses identified during the course of discovery. (Doc. # 91-2 at 1, 3). Plaintiff disclosed in her second amended set of initial disclosures (issued after Defendant had sent its amended initial disclosures) that Abdul-Barr was a potential witness with information about "Ms. Chaney's interactions with team members." (Doc. # 93-1 at 7). Moreover, Defendant asserted in a July 2016 interrogatory response that Abdul-Barr had worked under Chaney's supervision. (Doc. # 93-2 at 6-7). Thus, Plaintiff had at least two months to arrange a deposition or compel other discovery from Abdul-Barr if she desired to do so. As Defendant informed Plaintiff that her witnesses might have information that would be used to support its defenses, and Plaintiff identified Abdul-Barr as a possible witness, Defendant did not violate Rule 37(c)(1) by submitting Abdul-Barr's affidavit.

Likewise, Defendant did not violate Rule 37(c)(1) by submitting Raymer's affidavit. Of course, the better practice in discovery is to disclose the names of all potential witnesses in a party's disclosures or supplements to initial disclosures. Having said that, Raymer was identified as an employee in the community pharmacy team in the July 2016 interrogatory responses. (*Id.* at 6-8). This statement, provided a few months before the end of discovery, put Plaintiff on notice that Raymer could have information about Chaney's interactions with the team to support

Defendant's defenses. *See Shackelford v. Publix Super Markets, Inc.*, 2014 WL 5148461, at *6 (N.D. Ala. Oct. 14, 2014) (finding that a plaintiff had disclosed witnesses used at the summary judgment stage when she identified them during a deposition). And, arguably, such notice was unnecessary here because in her deposition Plaintiff herself acknowledged that Raymer was on the community pharmacy team. (Doc. # 82-3 at 175-76). Because Defendant sufficiently disclosed Abdul-Barr and Raymer as possible witnesses during the discovery process, Plaintiff's motion to strike is due to be denied.

### E. Admissibility of Summary Exhibits to Plaintiff's Opposition Brief

Plaintiff has incorporated four "cumulative summaries" into her statement of undisputed facts. (Doc. # 95 at 18). Her submitted summaries include (1) a chronological timeline of events during her employment with the community pharmacy team, (2) a list of Defendant's purported "misrepresentations of record facts," (3) a timeline of events supporting her claims of unlawful interference with federally-protected leave and invasion of privacy, and (4) a chart detailing the "race and team rankings" of liaisons on Defendant's community pharmacy team. (*See* Docs. # 94-3, 94-4, 94-5, 94-6). In its reply brief, Defendant argues that the court should not include the four summaries in the Rule 56 record because "[t]he documents cited in these summaries speak for themselves and are not so voluminous to warrant inclusion of [the] summaries." (Doc. # 100 at 5).

Federal Rule of Evidence 1006 provides that a party "may use a summary, chart, or calculation to prove the content of voluminous writings, records, or photographs that cannot be conveniently examined in court." Once admitted, a Rule 1006 summary is considered substantive evidence. *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004). Rule 1006 summary evidence can be submitted at the summary judgment stage. *See*

*Mitchell v. Univ. of La. Sys.*, 154 F. Supp. 3d 364, 380 n. 8 (M.D. La. 2015) (citing *F.T.C. v. Hughes*, 710 F. Supp. 1520, 1524 (N.D. Tex. 1989)). For a summary to be admitted in court as substantive evidence, the proponent must provide a proper foundation for its admission, which should include the testimony of the witness who prepared it or supervised its preparation. *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 31 (1st Cir. 2011). And, a summary admitted under Rule 1006 must be based on materials or documents that are themselves admissible themselves under the Federal Rules of Evidence. *Peat, Inc.*, 378 F.3d at 1160.

Here, Plaintiff's four summary exhibits are not admissible under Rule 1006. None of the summary exhibits identify the available witness who prepared them or supervised their preparation. *Cf. Colon-Fontanez*, 660 F.3d at 31. Thus, the court cannot determine whether Plaintiff would be able to present a proper foundation for their admission at trial, and they must be excluded from the Rule 56 record as well. *Cf. id.* In addition, the summary providing a timeline of Plaintiff's employment (Doc. # 94-3), the summary describing Defendant's "misrepresentations of record facts" (Doc. # 94-4), and the summary describing the alleged pattern of interference and invasion of privacy (Doc. # 94-5) all are argumentative documents. Indeed, they are practically extensions of Plaintiff's opposition brief.[9] The Eleventh Circuit has cautioned courts to omit argumentative matter from Rule 1006 summaries; accordingly, the court finds that Documents # 94-3, 94-4, and 94-5 could not be reduced to admissible form at trial. *Peat, Inc.*, 378 F.3d at 1159-60. While Plaintiff's final summary exhibit, analyzing the community pharmacy team's ratings by race, is not necessarily an argumentative document, it

---

[9] The exhibit discussing Defendant's alleged misrepresentations clearly is an extension of Plaintiff's response to Defendant's statement of undisputed material facts. As such, it is not really a summary of evidence at all. Rather, it is a partisan response to a selective representation of facts from the record. It would strain credulity to suggest that such a document would be admissible at trial (or that any attorney would attempt to admit such a summary at trial).

does not identify the admissible evidence on which it is based.  (*See generally* Doc. # 94-6).  Nor does it show that the underlying rankings are too voluminous to be admitted at trial.  As such, the court finds that this summary exhibit should be excluded from the Rule 56 record as well.  But, it will give that content of the documents which is relevant appropriate consideration to the extent that their assertions are supported by record evidence.

## III.     Summary of Relevant Facts

Having plowed through the parties' multiple skirmishes about the contents of the Rule 56 record, the court now turns to addressing the relevant summary judgment facts.  The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### A.     Plaintiff's Work in the Community Pharmacy Team Before November 2013

Defendant hired Plaintiff as a community pharmacy liaison in February 2011.  (Doc. # 83-7).  Gina Chaney, a director for the community pharmacy team, interviewed Plaintiff with another director and hired her to work for the team.  (Docs. # 82-1 at 25, 34; 82-3 at 236).  Plaintiff was 55 years old when she began working for Defendant in March 2011.  (Doc. # 82-3 at 236).  Defendant's community pharmacy liaisons maintained contacts with pharmacies and influenced them to use Defendant's resources to ensure that individuals stayed on medication routines.  (*See, e.g.*, Doc. # 83-43 at 2).  As a community pharmacy liaison, Plaintiff educated pharmacists and pharmacy technicians about Defendant's products and sometimes promoted

particular products for Defendant. (Doc. # 92-1 at 2). Each liaison focused on communicating with approximately 150 high-volume pharmacies, designated as "locally engaged" pharmacies, throughout his or her territory. (*See* Doc. # 82-7 at 98-99). Plaintiff worked out of Birmingham, Alabama and was assigned to contact pharmacies throughout the entire state of Alabama. (Docs. # 82-7 at 96; 92-1 at 2). Chaney, Plaintiff's supervisor, never disciplined her formally and never placed her on a performance improvement plan.[10] (Doc. # 82-1 at 87-88). Chaney rated Plaintiff as a "proficient" employee throughout her tenure with the community pharmacy team. (Doc. # 92-1 at 4).

Defendant directed liaisons and other field employees to record calls to medical offices and medical professionals in an online database called GSK 360. (*E.g.*, Doc. # 82-1 at 107-08). Defendant assigned each liaison an individual account. (Doc. # 92-1 at 5). Plaintiff used a customer identification number to record her calls to locally engaged pharmacies. (*See id.*). Plaintiff received no complaints about her GSK 360 entries before December 2013. (*Id.* at 8).

According to testimony from Plaintiff's co-workers, Plaintiff sometimes commented on racial biases she perceived in Chaney's conduct. For example, Tresa Johnson states that Plaintiff "always made comments that Gina [Chaney] only liked Candace [Brown] because she's black." (Doc. # 83-8 at 3). Plaintiff also told Johnson that Chaney "favored folks because of their race." (*Id.*). And, Plaintiff remarked to Johnson that she would not be selected for a promotion because she was "not the right color." (*Id.*). At the same time, Plaintiff has testified about some comments she heard from her co-workers. According to Plaintiff's deposition testimony, Brown referred to her as "Paula Deen" on two occasions, the first of which occurred in 2011 or 2012. (Doc. # 82-3 at 108-12, 199). After the oldest liaison in the community pharmacy team resigned,

_____

[10] Plaintiff received a "coaching memo" from Defendant due to an issue with reporting expenses. (Doc. # 82-1 at 88).

Chaney told Plaintiff that they had "gotten rid of the old dead wood." (Doc. # 92-1 at 11). Plaintiff interpreted this comment as a derogatory reference to the former liaison's age. (*Id.* at 11-12).

**B.    The Breo Launch Project**

The community pharmacy team participated in a launch project for Breo, a corticosteroid, from November 4, 2013 to January 24, 2014. (Doc. # 82-7 at 87). The liaisons on the team received a list of pharmacies in the assigned territories -- distinct from the pre-existing list of locally engaged pharmacies -- to contact during the launch event. (*Id.* at 99-100). Plaintiff's assigned pharmacy list contained 250 pharmacies, whereas the other liaisons on the team were directed to contact 164 to 219 key pharmacies. (*Id.* at 100-101). Defendant provided training to the liaisons before the Breo launch project but did not offer specific instructions on recording these sales calls in GSK 360. (Doc. # 92-1 at 5).

Candace Brown, another liaison in the community pharmacy team, tracked the team's performance during the Breo project through visual tracker spreadsheets. (*See* Doc. # 92-1 at 7). On December 4, 2013, Brown informed Chaney that Plaintiff had not correctly reported her sales calls in GSK 360 because she had reported calls based on the professional she communicated with rather than the pharmacy she visited. (Doc. # 88-2 at 2). Brown recommended a "proactive intervention," including a face-to-face meeting where Tresa Johnson watched Plaintiff enter calls into GSK 360. (*Id.*). On December 12, 2013, Chaney directed Plaintiff to meet with Johnson "in her territory" and review how to enter calls into GSK 360. (Doc. # 83-22 at 2). Chaney instructed Plaintiff to drive to Pensacola, Florida, as Defendant would not reimburse an

employee for a flight unless the employee reserved the flight at least two weeks in advance.[11] (*See* Doc. # 82-1 at 256-57).

On December 13, 2013, Chaney recounted her concerns about Plaintiff's performance in a set of notes. (Doc. # 108-7 at 7). Chaney expressed concern that Plaintiff would not meet a progress goal by the end of 2013 because she had incorrectly entered calls into GSK 360. (*Id.*). Chaney noted a report from Johnson that Plaintiff "was going to call HR on me [Chaney] because of unrealistic expectations." (*Id.*). During her deposition, Chaney recalled discussing with Plaintiff whether she intended to call human resources. (Doc. # 82-1 at 259). But, "[Plaintiff] did not express to me [Chaney] that she had any issues or that she was going to HR, period." (*Id.*).

On December 16, 2013, Plaintiff met with Johnson in Pensacola, Florida for additional GSK 360 training. (*See* Docs. # 83-8 at 5; 92-1 at 8). (*See also* Doc. # 83-23 at 2) (containing an agenda for the GSK 360 training). On that date, Plaintiff told Johnson that she intended to report Chaney to human resources. (Doc. # 92-1 at 10-11). Plaintiff entered two days of sales calls into GSK 360 during her training with Johnson. (Doc. # 83-25 at 2). Plaintiff traveled from Pensacola to Tampa, Florida following the remedial training to interview for another position before flying back to Alabama.[12] (Doc. # 92-1 at 14). After the training session, Chaney instructed Plaintiff to edit the earlier call entries she had made into GSK 360. (Docs. #

---

[11]  The Rule 56 record confirms that Defendant required employees to submit flight reservations 14 days or more before departure unless a line manager approved an exception. (Doc. # 83-24 at 7-8).

[12]  The parties dispute whether Plaintiff violated a work rule or policy by flying for one leg of her travel. On the one hand, Chaney has testified that Plaintiff violated a work policy because she flew after Chaney had instructed her to drive to the training. (Doc. # 82-1 at 256-57). On the other hand, Plaintiff has averred that she did not violate any work policy because she did not seek reimbursement from Defendant for the flight. (Doc. # 92-1 at 14). Even putting aside the incredulity of a supervisor saying that an employee violated a work rule by flying on "her own time and own dime," the court notes that it must view the record in the light most favorable to Plaintiff. As such, the court finds that Plaintiff did not violate a work policy by choosing to fly on her return trip from Pensacola.

83-26 at 2-3; 92-1 at 14).  Plaintiff re-entered all of the sales calls she had made since the beginning of the Breo project by December 22.  (Doc. # 108-23).  Plaintiff has averred that she lost a week of earned vacation time because she had to re-enter the sales calls.  (Doc. # 92-1 at 15).  Chaney told Plaintiff that the vacation time could not be used in 2014.  (*Id.*).

Chaney believed that Plaintiff would not be able to reach all of the target pharmacies by the January 24, 2014 Breo launch deadline.  (Doc. # 82-1 at 115-17) ("So there were two pieces. There were calls that she had already done . . . that technically weren't done, because they're entered the wrong way.  And then there were other calls that she had to make that she was not going to have time to do if she had to enter all these calls in and get all these other calls done. There was no way.").  Plaintiff "communicated to Ms. Chaney that [she] would do whatever it took to reach [her] Breo launch goals."  (Doc. # 92-1 at 15).  But, on January 14, 2014, Brown informed Chaney and Johnson that, according to Defendant's activity reports, Plaintiff had not conducted a Breo sales call for 156 of the 249 target pharmacies.  (Doc. # 88-3 at 2).  Chaney decided to assign other community pharmacy liaisons to conduct Plaintiff's Breo sales calls.[13] (Doc. # 82-1 at 305).  On January 15, Chaney informed Plaintiff that other liaisons would conduct sales calls in Alabama for the Breo launch.  (Doc. # 88-4 at 2).  Chaney stated that "there [were] 133 stores that need[ed] to be called on and entered into the system accurately and timely between now and next Friday, January 24th.  It is unrealistic to see how you [Plaintiff] can successfully achieve this goal with so many stores left . . . ."  (*Id.*).  Chaney's last conversation with Plaintiff occurred on January 16, 2014.  (Doc. # 82-7 at 140).

---

[13]   The Rule 56 record does not indicate the precise date on which Chaney decided to assign Alabama pharmacies to other liaisons.  Chaney could not recall the date she made this decision during her deposition.  (Doc. # 82-1 at 305).  Brown recommended a plan, called "Operation Alabama," for dividing the pharmacy sales calls on January 14, 2014.  (Doc. # 88-3 at 2).

### C. Plaintiff's Family and Medical Leave Act ("FMLA")/Short-Term Disability Leave and Resignation

Plaintiff made a request for leave under the FMLA on January 17, 2014, and asked that her leave begin on January 20. (Doc. # 83-29 at 2). Carolyn Harriss, a nurse case manager in Defendant's employee health and services department, managed Plaintiff's FMLA and short-term disability leave. (Doc. # 82-2 at 41-42). Harriss asked Plaintiff to complete medical paperwork for the leave request by February 4, 2014. (*Id.* at 43). Harriss disclosed Plaintiff's request for FMLA and short-term disability leave to Chaney at approximately 8 A.M. on January 20. (*See* Doc. # 92-17 at 1) (noting that Chaney received a copy of an e-mail sent to Plaintiff by Harriss). Chaney e-mailed Lorenzo Claridy, another regional manager for the community pharmacy team, about Plaintiff's short-term disability leave that same day at 9:30 A.M. (Doc. # 108-11 at 4). Later on January 20, Chaney informed Leslie Shoenfelt about Plaintiff's short-term disability leave and sent Shoenfelt a copy of Plaintiff's letter requesting leave. (*Id.* at 5).

On January 24, 2014, Chaney asked Shoenfelt about certain expense reimbursement requests from Plaintiff that Chaney believed to be questionable. (Doc. # 108-16 at 1). For example, Chaney recounted that Plaintiff often requested reimbursement for office supplies in amounts for which she did not need to provide a receipt. (*Id.*). Chaney also reported that she had rejected a reimbursement request because it contained a receipt with the signature of Plaintiff's daughter. (*Id.*). Plaintiff explained to Chaney that it was a mistake by a vendor. (*Id.*). Shoenfelt responded that Chaney would "have to let them go" and get explanations for any future questionable purchases. (*Id.*).

Defendant approved Plaintiff's request for FMLA and short-term disability leave on February 6, 2014.[14] (Doc. # 108-21 at 5-6). At the time Plaintiff's disability leave began, Dr. Eric Crowe diagnosed her with major depressive disorder and generalized anxiety disorder and estimated that she would be able to return to work on March 14. (*Id.* at 7-8). Marian DeLoach, a licensed therapist, estimated in February 2014 that Plaintiff would be able to return to work on June 15 without restrictions. (*Id.* at 9). DeLoach submitted 12 short-term disability benefit statements to Defendant between February 2014 and May 2014. (*See generally* Doc. # 83-33). Dr. Crowe also submitted three disability benefit statements to Defendant during that period. (Doc. # 108-21 at 7, 12, 15).

On February 26, 2014, Plaintiff submitted an expense report for her expenses from January 17 to February 26. (Doc. # 83-56 at 2-3). On March 26, 2014, Chaney denied some of the reimbursement requests and reminded Plaintiff that she needed to submit a receipt for her cell phone reimbursement request. (*Id.* at 4). Chaney denied a $30.00 reimbursement request for telecommunications equipment because Plaintiff had exceeded her monthly telecommunications budget of $150. (*Id.*). Chaney denied a $20.00 transportation reimbursement request from February 1, 2014 because Plaintiff sought reimbursement for a car wash. (*Id.* at 4). Finally, she denied a $16.86 reimbursement request for office supplies because Plaintiff had incorrectly designated the office supplies as a travel expense. (*Id.*). Plaintiff has testified that Chaney refused to approve her reimbursement requests, even after Plaintiff notified her of late charges assessed by American Express. (Doc. # 92-1 at 21).

---

[14] Defendant's short-term disability policies required Plaintiff to be available for communications with a member of its disability management team. (Doc. # 88-5 at 3). The policies also required Plaintiff to be physically available for an examination by a physician. (*Id.*). And, they obligated Plaintiff to work with Defendant and her healthcare providers to determine alternative work arrangements. (*Id.*).

Chaney discussed Plaintiff's FMLA leave with Harriss on February 28, 2014. (Doc. # 92-20). According to Chaney, Harriss asked her whether Plaintiff had performance issues. (*Id.*). Chaney reported to Harriss that Plaintiff had "many work issues." (Doc. # 83-36 at 3). Chaney noted that the company could suspend Plaintiff's disability benefits, but Plaintiff still had FMLA leave. (Doc. # 92-20). Chaney also noted, in bold, that "**Anne has used 6 weeks of her FMLA [leave;] it exhausts on 4/12**." (*Id.*) (emphasis in original). Chaney explained during her deposition that a case manager usually updates the employee's supervisor before the employee returns from disability leave.[15] (Doc. # 82-1 at 335).

Harriss contacted DeLoach in March 2014 and questioned the medical necessity of the length of leave DeLoach had recommended. (Doc. # 108-21 at 22). According to Harriss, return to work guidelines provided that employees who had been hospitalized for depression generally needed 28 to 42 days of leave. (*Id.*). Harriss asked DeLoach to provide more information about Plaintiff's depression because estimated return to work date was "considerably beyond best practice guidelines." (*Id.*). DeLoach responded in April 2014 that Plaintiff suffered from memory problems, lack of focus, and periods of withdrawal, despite her weekly therapy sessions. (*Id.* at 23). Harriss also communicated with Plaintiff during her disability leave and asked about Plaintiff's "ongoing medical treatment and [her] emotional state." (Doc. # 92-1 at 20). During these communications, Plaintiff perceived that Harriss was minimizing the severity of Plaintiff's medical condition. (*Id.* at 20-21). Also, according to Plaintiff, Harriss accused her of not needing disability leave. (*Id.* at 21). Harriss asked Plaintiff for "personal and confidential

---

[15] During March 2014, Plaintiff received a notice from Defendant's American Express corporate card program that informed her of overdue balances on her corporate card. (Doc. # 108-26). Approximately $200 of payments on the card were more than 30 days overdue. (*Id.*).

details," although the Rule 56 record does not indicate precisely what confidential or private information Harriss asked for.[16]  (*Id.* at 21).

On April 2, 2014, Harriss directed Plaintiff to participate in a disability evaluation by Dr. Paul O'Leary.  (Doc. # 108-21 at 37).  Plaintiff agreed to the medical evaluation.  (Doc. # 83-36 at 3) (noting voicemail message).  Dr. O'Leary recounted in his evaluation report that Plaintiff had "spent a significant amount of time in bed" during her first month of disability leave.  (Doc. # 83-37 at 5).  But, Plaintiff's activity level and ability to complete activities significantly improved during the following two months.  (*Id.*).  Plaintiff believed that she could perform her job duties, but she was "concerned" about returning to work "because she would be 'set-up' to fail."  (*Id.*).  Specifically, she expressed concerns about her supervisor and described Chaney as "abusive, cold, and an unfair supervisor."[17]  (*Id.* at 5-6).

Dr. O'Leary diagnosed Plaintiff with adjustment disorder, major depressive disorder, and generalized anxiety disorder.  (*Id.* at 13).  Dr. O'Leary concluded that Plaintiff had suffered from depression and anxiety after a poor work evaluation but had returned to her baseline level by the time of her examination.  (*Id.* at 15).  Dr. O'Leary opined that Plaintiff's psychological conditions did not impair her work ability and that she was able to return to work.  (*Id.* at 16-17). He added a comment on Plaintiff's complaints:

> I stress the importance of recognizing that [Plaintiff] felt that she was unfairly supervised.  I do not know how accurate the comments about [Plaintiff's] supervisor were regarding age discrimination or racially motivated actions, nor do I have access to the data needed to make such a determination about validity, but [Plaintiff's] filing for disability and much of her anger toward the company involve her thinking she was treated unfairly.  Hence, it would greatly help

---

[16]  Plaintiff has averred that the calls were unnecessary because Dr. Crowe and DeLoach submitted the written medical updates required by Defendant's disability leave policy.  (Doc. # 92-1 at 21).

[17]  Plaintiff also recounted her suspicions that Brown had sabotaged her by removing data that Plaintiff had entered into GSK 360.  (Doc. # 83-37 at 7).

[Plaintiff's] attitude, and reduce her anger, if she believed that her concerns were being taken seriously and were investigated, regardless of the findings.

(*Id.* at 18).

Plaintiff called Harriss on May 2, 2014 and asked for time to review Dr. O'Leary's report with her provider. (Doc. # 83-36 at 2). On May 7, Harriss agreed to Plaintiff's request for an additional week to work on a return to work plan with her psychiatrist. (*Id.*). Plaintiff sought an appeal of the disability denial on May 10. (*Id.*).

Defendant terminated Plaintiff's short-term disability payments on May 12, 2014. (Doc. # 83-48 at 2). Harriss explained in the letter terminating disability benefits that the documents in Plaintiff's medical file did not support disability leave beyond that date. (*Id.*). She instructed Plaintiff to provide documentation supporting the requested disability leave by May 19, 2014 and asked Plaintiff to call her immediately. (*Id.*). Harriss informed Plaintiff that her 12 weeks of FMLA leave expired on April 11, 2014. (*Id.*). Defendant denied Plaintiff's appeal of the disability determination on May 29. (Doc. # 83-53 at 2).

On June 12, Defendant requested that Plaintiff return to work on June 16 and explained that a return to work meeting with Plaintiff and Chaney would be scheduled thereafter. (Doc. # 83-54 at 2). Plaintiff denies that Defendant offered her part-time accommodations or transitional accommodations to ease her return to work. (Doc. # 92-1 at 22). Plaintiff submitted her resignation on June 16, and Defendant accepted the resignation. (Doc. # 83-55 at 2). According to Plaintiff, she resigned because she "could not continue to work under a supervisor who had singled [her] out for humiliation and set [her] up for failure." (Doc. # 92-1 at 22). Neither party disputes that Plaintiff received more than twelve weeks of medical leave from Defendant prior to her resignation. (Docs. # 83-1 at 22; 95 at 16) (undisputed statement of fact in paragraph 35 of Defendant's statement of undisputed material facts).

## D.    Post-Resignation Events

According to Plaintiff's summary judgment affidavit, after her resignation, she made a verbal complaint about Chaney to Defendant's employee relations department around June 25, 2014.  (Doc. # 92-1 at 22).  She informed Defendant's representative that six employees had left the company due to Chaney's hostile treatment towards them.  (*Id.*).  Plaintiff did not receive a response from Defendant about her complaint.  (*Id.* at 23).  On September 12, 2014, one of Defendant's field operations administration employees identified 28 employees, including Plaintiff, who had received incentive overpayments during the first semester of 2014.  (*See* Doc. # 88-1 at 2).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 9, 2014.  (Doc. # 83-57 at 2).  Her discrimination charge complained of race discrimination, age discrimination, and disability discrimination.  (*Id.*).  Her charge also claimed that Defendant had interfered with her FMLA leave and retaliated against her for taking FMLA leave.  (*Id.* at 5).

In November 2014, US Payroll Services informed Plaintiff in a notice that she had been overpaid for her incentive compensation.[18]  (Doc. # 83-59 at 12).  The notice stated that Plaintiff's net overpayment was $1,750 and directed her to remit that amount to Defendant's overpayments department.  (*Id.*).  The notice warned Plaintiff that she would be responsible for income taxes paid on the incentive compensation if she did not remit the overpayment to Defendant by December 31, 2014.  (*Id.*).  Plaintiff has not disputed that Defendant requested repayment from all 28 former employees identified as receiving overpayments in the first

---

[18]    Defendant's overpayment policy explained to field sales employees that Defendant would seek repayment if a sales representative inadvertently received an overpayment due to eligibility issues, tie-in issues, or alignment issues.  (Doc. # 88-6 at 2).  Additionally, Defendant's policy stated that a collection agency would contact an employee if the employee did not choose to deduct overpayments from the next bonus check.  (*Id.* at 3).

semester of 2014.  (Docs. # 83-1 at 28; 95 at 18) (factual assertion in paragraph 64 of Defendant's statement of undisputed material facts).

In January 2015, US Payroll Services sent Plaintiff a second notice of the overpaid incentive compensation.  (Doc. # 83-59 at 14).  This notice said that Plaintiff had erroneously received incentive compensation "for the date beginning 5/9/2014."  (*Id.*).  Plaintiff did not remit the overpaid incentive compensation to Defendant.[19]  (Doc. # 82-3 at 128).

## IV.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*").  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v.*

---

[19]   The parties also dispute the effect of a collections notice from Southwest Credit in January 2015 related to AT&T's records showing that $127.01 was owed.  (Doc. # 83-59 at 16).  According to Plaintiff, Chaney refused to pay the AT&T bill, even though Defendant had provided Plaintiff with an iPad and mobile phone and did not ask her to return the devices when she resigned from employment.  (Doc. # 92-1 at 23-24).

*Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents

a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## V.    Analysis

After careful review, the court concludes that Defendant's motion for summary judgment is due to be granted.

### A.    Plaintiff has Abandoned Several of Her Claims That She Did Not Discuss in Her Opposition Brief

Defendant contends that the court should consider several of Plaintiff's claims to be abandoned because she did not respond to its arguments for summary judgment on those claims. (Doc. # 100 at 13-14). The court agrees, in part. Defendant is entitled to summary judgment for Plaintiff's ADA disability discrimination claim in Count Five of the Amended Complaint because she has expressly declined to pursue that claim further. (Doc. # 95 at 41 n. 15). Moreover, the court finds that Defendant is entitled to summary judgment for the racially hostile work environment claim in Count One of the Amended Complaint, the age discrimination claims in Count Two, and the FMLA retaliation claim in Count Three because Plaintiff has abandoned them. Although Plaintiff refers to the race and age discrimination claims in her summary judgment brief (*see* Doc. # 95 at 25-26), she argues that Defendant subjected her "to a retaliatory hostile work environment" (*id.* at 26) and presents grounds to support a retaliation claim (*see id.* at 26-40). Indeed, Plaintiff now insists that she suffered the harassment and negative conduct at issue after she complained about Chaney's biases towards younger African-American subordinates. (*Id.* at 30). But, Plaintiff notably does not claim that she suffered the harassment

and negative conduct due to her age or her race. (*See id.* at 30-32). Thus, the court finds that she has abandoned any claim based on a racially hostile work environment or age discrimination. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325-26 (11th Cir. 2000) (holding that a state law claim was effectively abandoned when a party failed to brief and argue the issue before the district court). Likewise, Plaintiff has abandoned any FMLA retaliation claim presented in Counts Three and Four of the Amended Complaint because her opposition brief only discusses a FMLA interference claim premised on Harriss's harassment of her.[20] (*See* Doc. # 95 at 41-43).

To be sure, Plaintiff claims that summary judgment should be denied because the Rule 56 record contains several disputes regarding facts that could be material to a race or age discrimination claim. (*See* Doc. # 95 at 27-30). The factual disputes regarding the GSK 360 database appear to be related to Plaintiff's retaliation claims, though, because Plaintiff contends that "Chaney took advantage of the opportunity to single out Brandon due to her outspokenness about racial bias and threats to report Chaney to HR." (*Id.* at 28). The derogatory references to "Paula Deen" and getting "rid of old deadwood" could be part of a racist or ageist abusive environment. (*Id.* at 29-30). But, Plaintiff does not connect the dots and explain the objectively or subjectively severe or pervasive abuse she suffered due *to her race or age*, as opposed to any complaints of discrimination.[21] (*See id.*).

---

[20] In addition, the retaliation claims addressed in Plaintiff's opposition brief are based on retaliation following her complaints against Chaney, rather than retaliation following her request for FMLA leave.

[21] Even if Plaintiff had not abandoned her racially hostile work environment claim or ageist hostile work environment claim (and, to be clear, she has), the court cannot discern the objectively severe or pervasive abuse she suffered due to her race or age. The isolated derogatory comments Brown and Chaney made to Plaintiff do not constitute severe or pervasive harassment. *Cf. Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Moreover, Plaintiff has not presented a *prima facie* case of disparate treatment discrimination under Title VII of the Civil Rights Act or the Age Discrimination in Employment Act ("ADEA") because she has not identified an adverse employment action she suffered due to discrimination. (*See* Doc. # 95 at 30-32) (arguing that the adverse employment action was a hostile work environment).

**B.    Defendant is Entitled to Summary Judgment for Plaintiff's Title VII and ADEA Retaliatory Hostile Work Environment Claim**

In this motion, Defendants argue that Plaintiff did not face a hostile work environment because she merely suffered isolated incidents of abusive conduct. (Doc. # 83-1 at 37-38). Moreover, Defendant insists that Plaintiff cannot establish its liability for any hostile work environment because she did not utilize its anti-discrimination policy. (*Id.* at 38-39). Additionally, Defendant contends that Plaintiff did not engage in protected conduct before October 2014, when she filed her EEOC charge. (*Id.* at 41).

Plaintiff responds that her complaints about Chaney's biases qualified as opposition to discriminatory practices and thus are protected conduct. (Doc. # 95 at 31). After making the complaints, she argues that she faced severe and pervasive harassment because Chaney attempted to sabotage her career, reported GSK 360 data entry issues discovered before December 13, 2013 to human resources, required Plaintiff to travel five hours by car for a training session, directed Plaintiff to re-enter sales calls into GSK 360, assigned pharmacies in Plaintiff's territory to other employees, reported expense reimbursement concerns, refrained from communicating with Plaintiff after Plaintiff applied for disability leave, lobbied to suspend Plaintiff's disability leave, and declined to consider a transition period following the end of the short-term disability leave. (*Id.* at 32-39). Plaintiff contends that this harassment was causally connected to her protected complaints because Chaney began her abusive conduct on the day that she learned Plaintiff would report her to Defendant's human resources office. (*Id.* at 39-40).

Defendant replies that Plaintiff never engaged in protected conduct because she did not report Chaney's conduct to a supervisor or file an internal grievance. (Doc. # 100 at 17-18). According to Defendant, Plaintiff's complaints should not be protected under Title VII because they concerned her belief that Chaney had unrealistic expectations. (*Id.* at 18). Additionally,

Defendant denies that the scrutiny Plaintiff received can be classified as severe or pervasive harassment. (*Id.* at 19-20).

To prevail on a retaliatory hostile work environment claim, a plaintiff must show that: (1) he or she engaged in protected activity; (2) after doing so, he or she was subjected to unwelcome harassment; (3) his or her protected activity was a "but for" cause of the harassment; and (4) the harassment was sufficiently severe or pervasive to alter the terms of employment. *Baroudi v. Sec'y, Dep't of Veterans Affairs*, 616 F. App'x 899, 904 (11th Cir. 2015) (citing *Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012)). A plaintiff also must show that the employer is liable for the hostile work environment under a theory of direct or vicarious liability. *Jones v. City of Lakeland*, 318 F. App'x 730, 735 (11th Cir. 2008).

> **1.     Plaintiff Did Not Engage in Activity Protected by Title VII or the ADEA When Complaining to Her Co-Workers About Chaney's Conduct**

Title VII prohibits an employer from retaliating against an employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter" or for making a charge, testifying, assisting, or participating "in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The first clause in the anti-retaliation provision is referred to as the "opposition clause," while the second clause is referred to as the "participation clause." Since she has not argued that she participated in or assisted an investigation before her resignation, Plaintiff's pre-resignation retaliatory hostile work environment claim necessarily is premised on the opposition clause.

To establish that he or she committed protected conduct under Title VII's opposition clause, a plaintiff must show that he or she "explicitly or implicitly communicate[d] a belief" that the employer was committing "unlawful employment discrimination." *Murphy v. City of*

*Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (quoting EEOC Compl. Man. (CCH) §§ 8-II-B(2) (2006)).   The opposition clause protects both informal complaints to an employee's superiors and the use of an employer's "internal grievance procedures."   *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).   In *Murphy*, the plaintiff had asked a city manager to stop bullying her and had informed others, including a city commissioner, that the city manager used vulgar language towards her.   383 F. App'x at 918. However, because the plaintiff did not report the manager's conduct to the city and did not inform others that the manager's conduct was "sexually hostile or sexually harassing," the Eleventh Circuit upheld the district court's grant of summary judgment to the defendant for the plaintiff's retaliation claim.   *Id.*

In addition, to show that she made a complaint protected under the opposition clause, a plaintiff must "show[ ] that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."   *Little v. United Techns., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).   That is, a plaintiff must show that she subjectively believed the employer engaged in unlawful discrimination and that the belief was "*objectively* reasonable in light of the facts and the record present."   *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (emphasis in original) (quoting *Little*, 103 F.3d at 960).   This court must analyze a plaintiff's beliefs about the purported discriminatory conduct against the existing substantive law to determine whether the beliefs were objectively reasonable.   *Id.* at 1245.

Here, Plaintiff's complaints to Johnson about Chaney's racial biases before December 2013 are not protected complaints of discrimination under Title VII's opposition clause or the ADEA.   (*See* Doc. # 83-8 at 3).   This is so because the complaints were made to a co-worker who was not a supervisor or an employee responsible for receiving internal grievances.   *Cf.*

*Rollins*, 868 F.2d at 400. Moreover, even if the court could consider Plaintiff's informal complaints to Johnson about Chaney's favoritism to be protected conduct (and, to be clear, it cannot), Plaintiff has not presented substantial evidence indicating that these complaints were a but-for cause of the alleged hostile work environment she faced at the end of her employment with Defendant. *See Baroudi*, 616 F. App'x at 904. Johnson has denied that she reported Plaintiff's comments about favoritism to Defendant's human resources department. (Doc. # 83-8 at 3). Additionally, she has not stated that she relayed Plaintiff's allegations of favoritism to Chaney.[22] (*Id.*). Ultimately, Plaintiff cannot present a triable hostile work environment claim based on her allegations of Chaney's favoritism towards African-American employees because (a) those allegations cannot be considered protected conduct under Title VII or the ADEA, and (b) they cannot be causally connected to the alleged hostile work environment she suffered based on the Rule 56 record.

Plaintiff's threats to report Chaney to human resources in December 2013 also do not qualify as protected conduct under Title VII or the ADEA. By her own account, Plaintiff never informed Johnson that she intended to report race discrimination, sex discrimination, age discrimination, or any other form of unlawful employment conduct to human resources. (*See* Doc. # 92-1 at 10). Rather, Plaintiff complained to Johnson that Chaney had "singl[ed her] out for adverse treatment," "treated [her] like [she] could do nothing right," and caused her GSK 360 data to disappear.[23] (*Id.*). As in *Murphy*, although Plaintiff's comments accused Chaney of engaging in unpleasant and disreputable conduct, she did not in her remarks accuse Chaney of

---

[22] Notably, the court cannot determine whether Plaintiff's allegations of favoritism were made in close temporal proximity to the inception of the alleged hostile environment in December 2013 because Johnson has not testified about when she heard the comments. (*See* Doc. # 83-8 at 3).

[23] Chaney's written notes corroborate Plaintiff's testimony about the statements made to Johnson in December 2013. According to Chaney's notes, Plaintiff intended to report her for "unrealistic expectations." (Doc. # 108-7 at 7).

unlawful employment discrimination. *Cf. Murphy*, 383 F. App'x at 918 (affirming summary judgment to defendant on a retaliation claim where the plaintiff's informal complaints never informed the listener of sexually hostile or sexually harassing conduct). Therefore, Plaintiff's threats cannot be considered protected conduct to support a Title VII or ADEA retaliation claim, and Defendant is due to be granted summary judgment on Plaintiff's retaliatory hostile work environment claim.

> **2. Alternatively, Plaintiff Did Not Suffer Severe or Pervasive Harassment Following Her Complaints to Johnson Before December 2013 or Following Her December 2013 Threat to Report Chaney to Human Resources**

The harassment suffered by a plaintiff must meet both an objective and subjective standard to support a hostile work environment claim. *Gowski*, 682 F.3d at 1312. That is, the harassment must create an environment that a reasonable person would find hostile or abusive, and the plaintiff must subjectively perceive that the environment is hostile or abusive. *Id.* To evaluate the objective severity of alleged harassment, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* (quoting *Miller*, 277 F.3d at 1275). "These four components are viewed together; for instance, infrequent conduct will not necessarily preclude a claim as a matter of law, particularly if the conduct is sufficiently severe, threatening, and/or interferes with an employee's job." *Shaling v. UPS Ground Freight*, 202 F. Supp. 3d 1283, 1292 (N.D. Ala. 2016). "Teasing, offhand comments, and isolated incidents do not constitute discriminatory changes in the terms and conditions of employment." *Jones*, 318 F. App'x at 735.

Here, the alleged harassment Plaintiff experienced from March 2011 to December 2013 did not constitute objectively severe or pervasive harassment. Plaintiff asserts that Brown, a non-supervisor, twice referred to her as "Paula Deen" in a derisive manner. (Doc. # 95 at 29) (referring to Plaintiff's deposition). In addition, Chaney once described a former liaison as "old dead wood." (*Id.* at 29-30) (referring to Plaintiff's declaration). The court accepts Plaintiff's inference that these statements were derogatory references to Plaintiff's race, her age, or older workers in general. Having said that, these isolated derogatory comments (made over a two-year period) were not particularly severe, they did not physically threaten Plaintiff, and they did not interfere with her job performance. *Gowski*, 682 F.3d at 1312. Thus, such stray remarks are insufficient to demonstrate severe or pervasive harassment.[24]

Furthermore, the alleged harassment Plaintiff experienced after December 2013 cannot be classified as objectively severe or pervasive harassment.[25] As an initial matter, the court cannot consider many of the incidents that form the basis of Plaintiff's hostile work environment claim, such as Chaney's comments to human resources personnel and other supervisors, because Plaintiff has not demonstrated that she knew of these communications while she worked for Defendant. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014) (holding

---

[24] Plaintiff appears to concede the lack of severe or pervasive harassment before December 2013, as her brief focuses on the harassment she suffered during and after December 2013. (*See* Doc. # 95 at 33-39).

[25] As outlined above, Plaintiff points to the following conduct before the start of her FMLA leave as the severe or pervasive harassment she suffered following her statement in December 2010: (1) Chaney's report to human resources about Plaintiff's alleged GSK 360 errors; (2) Chaney's reports to Bill Story and Maja Hall about the GSK 360 errors; (3) the training session on December 16, 2013, for which Plaintiff was required to travel five hours by car on a Sunday; (4) Chaney's directions to Plaintiff to re-enter sales calls into the GSK 360 system; and (5) Chaney's reassignment of stores in Plaintiff's territory to other members of the community pharmacy team. (Doc. # 95 at 33-36). Plaintiff also points to some conduct by Chaney and others following the start of her FMLA leave as severe or pervasive harassment, including: (1) Chaney's inquiries into "questionable" reimbursement requests by Plaintiff; (2) Chaney's instructions to Brown to search for more GSK 360 errors; (3) Chaney's comments to other supervisors once she was informed that Plaintiff had requested FMLA leave; (4) Chaney's failure to communicate with Plaintiff about covering her work assignments while she was on FMLA leave; (5) Chaney's reports to Harriss about Plaintiff's performance issues; and (6) Defendant's failure to propose an alternative work arrangement to accommodate Plaintiff when she returned from FMLA leave. (*Id.* at 36-39).

that a district court correctly declined to consider "evidence that the plaintiff did not know about" when evaluating whether the plaintiff had been exposed to an objectively hostile work environment). Moreover, none of the incidents referenced by Plaintiff threatened physical harm to her. *Gowski*, 682 F.3d at 1312. Although, to some extent, the court agrees with Plaintiff that some of Chaney's conduct reflects the inception of a campaign to impugn Plaintiff's professional reputation, the court cannot say that such a "scheme" (as detailed in the Rule 56 record) constitutes severe or pervasive harassment. At most, it only continued for approximately six months, and the events and remarks complained of were interspersed throughout the six month period. In *Gowski*, for example, the Eleventh Circuit affirmed a jury's verdict on a hostile work environment claim because the retaliatory scheme to force resignations "was well-known and continued over a *period of years*." 682 F.3d at 1313-14 (emphasis added).

Additionally, the court cannot conclude that Chaney's reassignment of duties to other liaisons constituted harassment under the circumstances revealed by the Rule 56 record. Chaney realized that, with less than two weeks remaining in the Breo launch project, Defendant's electronic database indicated that over 100 pharmacies in Plaintiff's territory needed to be contacted. (*See* Doc. # 88-3 at 2). Even if Defendant's electronic records did not reflect all of the sales calls Plaintiff made from November to January, it was reasonable for a supervisor like Chaney to conclude that Plaintiff could not complete the assigned sales calls in less than two weeks and enter the sales calls accurately into GSK 360.[26] Chaney's legitimate reason for reassigning the sales calls undercuts Plaintiff's reliance on the reassignment as a basis for a hostile work environment. *See Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 892 (11th

---

[26] It must be remembered that Plaintiff received this assignment in early November 2013 and still needed to contact more than 100 pharmacies *after* she had allegedly corrected the mislabeled sales calls in late December 2013. And, the court notes that no admissible Rule 56 evidence supports Plaintiff's asserted belief that Brown manipulated her GSK 360 data.

Cir. 2015) (explaining that a reasonable employee would not consider a reassignment of duties to be an adverse action when the employee caused the reassignment by taking a lengthy leave of absence); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (explaining that the plaintiff's "allegations of insult [were] undercut by the legitimate reasons and constructive criticisms offered in the letters of counseling"). Even after considering the Rule 56 record in the light most favorable to Plaintiff, the court cannot find that she suffered severe or pervasive harassment after her December 2013 comments to Johnson. Thus, in the alternative, Defendant is entitled to summary judgment for Plaintiff's retaliatory hostile work environment claim because Plaintiff has not shown that she faced objectively severe or pervasive harassment.[27]

### C. Defendant is Entitled to Summary Judgment for Plaintiff's FMLA Interference Claim Because She Received the Full Period of Leave She was Authorized to Receive

Defendant argues that Plaintiff's FMLA interference claim fails as a matter of law because Plaintiff received more leave than she was entitled to under the FMLA. (Doc. # 83-1 at 43-44). Plaintiff responds that Defendant discouraged her from using FMLA leave by (a) pressuring her to disclose details about her medical treatment and medical condition and (b) directing her to complete a third-party medical examination. (Doc. # 95 at 42-43). For the reasons explained below, Defendant has the better side of the argument.

The FMLA prohibits a covered employer from interfering with, restraining, attempting to deny, or denying an eligible employee's rights under the FMLA. 29 U.S.C. § 2615(a)(1). To

---

[27] The court need not and does not decide whether Defendant is entitled to assert a *Faragher/Ellerth* defense at the summary judgment stage. Notably, a defendant is entitled to this defense if it reasonably acted to prevent and promptly correct harassing conduct. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Plaintiff disputes whether Defendant promptly investigated complaints of harassment because it did not follow up with her after she raised a complaint about Chaney's alleged harassment in June 2014. (*See* Doc. # 95 at 12) (disputing paragraph 2 of Defendant's statement of undisputed material facts). Although Defendant has asserted the *Faragher/Ellerth* defense, Defendant has not addressed this factual dispute in its reply brief. But, because the court concludes Plaintiff has failed to carry her burden of establishing a hostile work environment, the court does not address GlaxoSmithKline's affirmative defense.

raise a FMLA interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001). The Eleventh Circuit has applied *Strickland* to require a plaintiff to show that he or she was denied a benefit by the defendant to which he or she was entitled. *Martin v. Brevard Cty. Public Schools*, 543 F.3d 1261, 1266-67 (11th Cir. 2008); *Han v. Emory Univ.*, 658 F. App'x 543, 546 (11th Cir. 2016). An employee's FMLA benefits include the rights to take leave and be reinstated to his or her prior position following leave, subject to conditions. *Diamond v. Hospice of Fla. Keys, Inc.*, 2017 WL 382310, at *5 (11th Cir. Jan. 27, 2017). But, if an employee takes more than twelve weeks of leave, he or she is not entitled to reinstatement under the FMLA. *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1288-89 (M.D. Ala. Mar. 31, 2011). *See also Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1267-68 (11th Cir. 2017) (referencing caselaw reaching this conclusion without expressly adopting it).

Plaintiff's FMLA interference claim fails under binding Eleventh Circuit precedent because Plaintiff has not shown that Defendant denied her any FMLA benefit. *Martin*, 543 F.3d at 1266-67. In this case, it is undisputed that Plaintiff received more than twelve weeks of FMLA leave. (Doc. # 95 at 16) ("Plaintiff has not claimed that she received less than [twelve] weeks [of] FMLA leave or was improperly paid."). Moreover, Plaintiff never sought reinstatement to her former position. Even if Plaintiff had sought reinstatement, she would not have been entitled to reinstatement because she took more than twelve weeks of leave. *Freeman*, 777 F. Supp. 2d at 1288-89; (Docs. # 83-1 at 22; 95 at 16). Thus, Defendant is entitled to summary judgment for Plaintiff's FMLA interference claim.

Plaintiff argues that Defendant interfered with her FMLA leave by discouraging her from using her leave and cites the Department of Labor's regulations to support her argument. (Doc. # 95 at 42) (citing 29 C.F.R. § 825.220). But, Plaintiff cannot dispute that Defendant approved her request for FMLA leave and granted her all twelve weeks of FMLA leave. Nor does this case present a scenario where Plaintiff's supervisor discouraged her from using FMLA leave. By all accounts, Chaney never communicated with Plaintiff after she began using FMLA leave. (*See* Doc. # 82-7 at 140) (testimony by Chaney that she never conversed with Plaintiff after January 16, 2014). Thus, this case is distinguishable from FMLA interference cases premised on a supervisor or leave coordinator discouraging an employee from taking additional FMLA leave while he or she was using approved FMLA leave. *See, e.g.*, *Diamond*, 2017 WL 382310, at \*5-6 (finding a triable FMLA interference claim where a human resources supervisor told the plaintiff that her FMLA leave compromised the company's quality of care to customers and asked for additional documentation unrelated to proof that the plaintiff needed the leave). Because Plaintiff was not denied her FMLA benefits, Defendant is due to be granted summary judgment for her FMLA interference claim. *Martin*, 543 F.3d at 1266-67.

**D.  Defendant is Entitled to Summary Judgment for Plaintiff's Invasion of Privacy Claim**

Plaintiff has claimed that Defendant invaded her privacy by intruding into her medical affairs and "pressuring [her] to disclose personal and confidential medical information" during her period of disability and FMLA leave. (Doc. # 95 at 44). Defendant argues that the invasion of privacy claim is meritless because (a) Plaintiff agreed to communicate with Harriss during her disability leave as a term of receiving paid medical leave, and (b) Plaintiff agreed to submit medical records that contained the confidential information at the core of her invasion claim. (Doc. # 83-1 at 46-47). The court agrees with Defendant.

Under Alabama law, a defendant can be liable for invasion of privacy if it intentionally intrudes "upon the solitude or seclusion of another or his private affairs or concerns" and if the intrusion is "highly offensive to a reasonable person." *Johnston v. Fuller*, 706 So. 2d 700, 702 (Ala. 1997) (quoting Restatement (Second) of Torts § 652B (Am. Law Inst. 1977)). Among other means not at issue in this case, a defendant can offensively intrude into a plaintiff's private affairs by using "excessively objectionable and improper" means to gather information. *Id.* (citing *Hogin v. Cottingham*, 533 So. 2d 525 (Ala. 1988)). Courts primarily consider the means a defendant has used to intrude into a plaintiff's private information and the defendant's purpose for seeking private information to determine whether the intrusion is sufficiently offensive. *Hogin*, 533 So. 2d at 531.

Although a casual observer might believe that this is a broad tort action, the Alabama Supreme Court has stated that wrongful intrusion covers a "limited scope" of conduct. *Johnston*, 706 So. 2d at 702-03. For example, in *Johnston*, the Alabama Supreme Court declined to extend intrusion liability to defendants who had voluntarily interviewed third parties to discover publicly known information during an investigation. *See id.* Likewise, in *Johnson v. Corporate Special Services, Inc.*, the Alabama Supreme Court recognized that an individual must expect a reasonable inquiry and investigation when making a claim against a worker's compensation fund. 602 So. 2d 385, 387-88 (Ala. 1992). Therefore, the Court affirmed a summary judgment in favor of an investigator who had scrutinized the plaintiff's outdoor activities because (a) the investigator had a legitimate reason for surveillance, and (b) his intrusion into the plaintiff's affairs was not wrongful because anyone could have observed the plaintiff's outdoor activities. *Id.*

Here, even after considering the evidence in the light most favorable to Plaintiff, the court finds that Harriss's inquiries into Plaintiff's medical condition do not qualify as a highly offensive invasion of privacy. Harriss had a legitimate reason to ask Plaintiff about her medical condition because she was handling Plaintiff's request to Defendant for paid disability leave. *Cf. Johnson*, 602 So. 2d at 387-88 (describing an investigator's legitimate reasons for scrutinizing an employee who had filed a claim for worker's compensation benefits). Nor can the court say that Harriss used objectionable and improper means to obtain medical information for which she had a legitimate interest. As a condition of receiving paid disability leave, Plaintiff agreed "to be available for contact" from Defendant's disability management division. (Doc. # 88-5 at 3). And, she agreed to work with her healthcare providers and Defendant to determine alternative work arrangements, if possible.[28] (*Id.*). Defendant's disability leave policies submitted to the court do not specify all the types of communications an employee on disability leave could expect from a disability manager. But, as Plaintiff knew that the company would attempt to provide alternative work arrangements, Plaintiff reasonably should have expected some discussion about her medical problems and options for working around them. Just as a personal injury plaintiff is not entitled to the same degree of privacy when she subjects herself to public observation, *Johnson*, 602 So. 2d at 388, when an employee puts at issue her health in connection with a claim for disability leave, she is not entitled to withhold private medical information related to that disability claim from her employer. Based on the Rule 56 record, the

---

[28] Moreover, Plaintiff allowed her healthcare providers to transmit confidential medical information to Harriss so that she could receive disability benefits. (*See generally* Docs. # 83-33; 108-21 at 7, 12, 15).

court finds no material dispute of fact from which a jury could reasonably find a highly offensive intrusion in Plaintiff's privacy and solitude.[29]

### E. Plaintiff Has Not Shown that She was Constructively Discharged

Plaintiff contends that Defendant constructively discharged her by removing her responsibility over a territory, impeding her from transferring to a different team, and permitting Chaney to sabotage Plaintiff's efforts towards a transfer. (Doc. # 95 at 45-46). Defendant argues that it should be granted summary judgment on the constructive discharge claim because (1) Plaintiff cannot show that her working conditions were poor enough to compel her resignation, and (2) Plaintiff did not avail herself of the anti-harassment remedies available through the company. (Doc. # 83-1 at 49-52). The court agrees with Defendant that Plaintiff cannot show that her working conditions compelled her resignation.

It has been said that winners don't quit, and quitters don't win. But a legal exception to this life rule is in the area of constructive discharge. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). To demonstrate a constructive discharge, a plaintiff must show that his or her working conditions were so unbearable that they would compel a reasonable person to resign. *Id.* Eleventh Circuit precedent is clear that a constructive discharge claim requires a plaintiff to show more than a hostile work environment. *Id.* Thus, because the court already has found that Plaintiff has failed to present a hostile work environment, it also finds that she has presented no genuine issue of material fact

---

[29] Significantly, Plaintiff's testimony does not suggest that Harriss asked Plaintiff about conditions other than her depression. (Doc. # 92-1 at 20-21). Nor does it indicate the "personal and confidential details" that Harriss sought in her questioning. (*Id.* at 21). The court recognizes that Plaintiff complied with the medical update requirements in Defendant's disability leave policy. (*Id.*). At the same time, Harriss reasonably asked Plaintiff's therapist why the requested term of disability leave was significantly longer than the term recommended by return to work guidelines. (Doc. # 108-21 at 22). As Plaintiff's period of disability leave was significantly longer than that indicated by return to work guidelines, the court cannot find on this record that an issue exists as to whether Harriss's communications with Plaintiff were unnecessary harassment. (*See* Doc. # 92-1 at 21).

about whether her working conditions would compel a reasonable person to resign. Moreover, constructive discharge is merely a means for demonstrating that the plaintiff suffered an adverse employment action; it is not an independent ground for liability under Title VII or any other federal anti-discrimination statute. Plaintiff appears to argue that Defendant constructively discharged her by failing to respond to Chaney's harassment of her. (Doc. # 95 at 46). But, as explained above, Plaintiff cannot maintain a Title VII or ADEA retaliation claim because she never made a complaint protected by one of those statutes. Even putting aside that issue, Plaintiff has not established any factual basis for a constructive discharge claim here. As such, Defendant is due to be granted summary judgment for Plaintiff's constructive discharge claim.

## VI.    Conclusion

For the reasons explained above, Plaintiff's motion to strike (Doc. # 91) is due to be denied. Defendant's motion to exclude (Doc. # 98) is due to be granted in part and denied in part. Finally, Defendant's motion for summary judgment (Doc. # 83) is due to be granted. An order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this July 6, 2017.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE